*Perkinson v. Perry*, No. 607-10-13 Wncv (Teachout, J., December 18, 2014)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

### STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Washington Unit** | **Docket # 607-10-13 Wncv** |

**GORDON PERKINSON,**
**CHRISTINE BARNES, and**
**WILLIAM ALLARD,**
    **Plaintiffs**

    **v.**

**JAMES PERRY and LAURA PERRY,**
    **Defendants**

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter came before the court for final hearing on the merits on November 19, 2014. Plaintiffs are represented by Attorney Paul S. Gillies. Defendants are represented by Attorney Austin R. Gray. All parties and their attorneys attended a site visit conducted by the court prior to presentation of evidence.

In this declaratory action, all parties seek a declaration with respect to an easement and access road that crosses Defendants' land and is for the benefit of lots owned by all parties and others. Specific issues are placement of fences within the easement area, and allocation of maintenance costs.

### Findings of Fact

The parties are owners of three out of five lots created from land previously owned by Ronald A. and Thelma F. Wright on Little Northfield Road in the Town of Northfield. The Defendants, the Perrys, own former Wright land with frontage on Little Northfield Road. Access to the other four lots is over a road, "Windy Meadow Road," on a 50-foot wide right of way that crosses the Perry land. For the first 782.5 feet from Little Northfield Road, the right of way is shared by all five owners, including the Perrys. At that point, the Perrys' right to use the easement ends, as does the right of the owners of the two lots to the east, both of which are presently undeveloped. The right of way continues to the north across Perry land for the benefit of the two remaining lots, both of which are developed with residences: one is owned by Plaintiff William Allard, and the other is owned by Plaintiffs Gordon Perkinson and Christine Barnes. The disputes in this case only pertain to the first 782.5 feet held in common by all five lot owners.

The easement at issue was created in the 1999 deed from the Wrights to Plaintiffs William Allard and Gordon Perkinson and others, who were the first purchasers of the lots affected. All terms related to the easement are as follows:

Also conveyed hereby is a right-of-way described as follows. The conveyed right-of-way is 50' in width and extends across the Grantors' retained lands in a northerly direction from the Little Northfield Road to the lands and premises herein conveyed. The metes and bounds describing the location of the said 50' right of way are specified in the above described survey plan of Lawrence. The within Grantees and their heirs, executors, administrators and assigns may use the said conveyed right-of-way for access to the within conveyed lands and premises by all reasonable means and for the construction, maintenance, repair and replacement of above and below ground utility lines for service to the within conveyed premises.

The within conveyed right-of-way may be used in common only for that portion of its length between the Little Northfield Road and the point of intersection of the easterly side of the right-of-way with lands now or formerly of Flynn (a distance of approximately 782.5'). Northerly of the said intersection with Flynns' land, the right of-way shall be for the exclusive use of the Grantees and their successors in title.

Grantors, for themselves and their heirs, executors, administrators and assigns, reserve the right to use and improve the above described common portion of the said right-of-way for the installation of a roadway for access by all reasonable means to the reserved lands of the Grantors and for the installation of above and below ground utilities. Grantors and Grantors' successors to Grantors' reserved lands and premises shall not be required to pay any costs or expenses for the construction, maintenance or replacement of any improvements on the said common right-of-way until such time as Grantors or Grantors' successors in title shall make significant use of the said improvements.

At such time as Grantors and/or their successors in title shall become obligated to share expenses of the right of way, they shall not be required to reimburse other users for any past expenditures for the right-of-way, but Grantors and/or their successors shall share all reasonable costs thereafter incurred for the construction, maintenance, repair or replacement of improvements on or for the right-of-way which are used by Grantors or Grantors' successors in title in common with others. The shared expenses shall be prorated among the parties responsible for payment, the share of each to be based upon the number of lots owned by each party which are served by the shared improvements. The within obligation to pay for the costs of the right-of-way shall run with the land.

Grantors also reserve, for themselves and their heirs, executors, administrators and assigns, the right to grant to others rights and easements to use the common portion of the within conveyed right-of-way for access and utility purposes.

2

The within conveyed right-of-way is subject to all pre-existing rights of others to use the same.

Shortly after purchasing in 1999, Mr. Allard hired a contractor to construct Windy Meadow Road on the easement. The construction included gravelling and ditching. He began building his residence in 2000 and moved in during 2001. It is unknown when the Perkinson residence was constructed or when the road began to be used for access to that lot. The Perrys moved to their residence in approximately 2004. For access to their residence, they created a driveway which is a spur from near the north end of the common portion of Windy Meadow Road. Mr. Allard asked if they were interested in sharing in the original cost of road construction and power installation, and they declined. The terms of the easement specifically did not require them to make such a contribution. As to costs of maintenance of the road, such as grading, they began sharing equally with Allard and Perkinson in a three-way equal split of such costs as provided in the deed. Mr. Allard himself does the winter snowplowing.

There are telephone poles on the west side of the common road that are very close to the westerly edge of the developed roadway, at least for some distance as the road leaves Little Northfield Road. There are ditches on both sides of the common road. The ditch on the west side of the common road is particularly pronounced and clearly provides a channel for runoff from the adjacent slope. On the east side, there is a shallow ditch for about the first 140 feet from Little Northfield Road. Where Windy Meadow Road leaves Little Northfield Road, the width of the traveled portion of the common road, between the ditches, is approximately 16 feet. It is somewhat wider at points further to the north. The exact width at any point is unknown. When Mr. Allard was asked in testimony whether the travel width he plows in winter is as wide as 25', he responded "pretty close." The court infers from testimony and visual observation during the site visit that the traveled width of the graveled common portion of Windy Meadow Road is between 16 and 20 feet, with shoulders extending beyond the edges of the graveled portion to the ditches on both sides. There is considerable growth of grass on the shoulders.

In 2006, James Perry, formerly an engineer, began engaging in farming the land as a full time occupation. He raises and sells cows, pigs, and sheep. He uses moveable fences to fence in the animals from roughly May to October each year, which is the period when there is grass available for the animals to graze. He uses a narrow strip of land to the east of the common portion of Windy Meadow Road, near Little Northfield Road, for the sheep. He uses the first 140 feet where the ditch is shallow. He carries moveable fencing and installs the western line of it close to the graveled, traveled portion of the road, including within the fenced area both the ditch and the shoulder, to maximize the grass available for the sheep. The sheep fencing is moved from time to time to rotate the grazing location of the sheep. On the west side of the common portion of Windy Meadow Road, near Little Northfield Road, he installs a sturdier form of portable fencing

3

that stays in fixed place from May to October, and is for the cows and pigs. This is also installed very close to the graveled, traveled portion of the road.

On both sides of the southerly portion of the road, the ditches are within the fenced off areas used for grazing. As a result of the Perrys' placement of fencing on both edges of the traveled portion of the road, for approximately 6 months of the year the ditches are not readily accessible for removal of debris, and the drivable width of the road between the fences is 14 feet.

Friction developed between the Plaintiffs and the Perrys over the Perrys' fencing in of the land as it affected the road. In addition, there was friction concerning responsibility for water runoff that affected the road. The Perrys' driveway off the common road was on a slope that resulted in runoff that tended to erode the common road, creating maintenance problems. As of the final hearing, the Perrys have installed a culvert and waterbars and a diversion mound where their spur joins the common road in order to prevent future erosion, and have represented that they will maintain these installations. The Plaintiffs are satisfied with this action and the representation as to future maintenance and this is no longer an issue in the case.

The friction over the fencing, which has been ongoing since 2006, has continued. The Perrys have wanted to maximize the available grass on their land for grazing, and have continued to install their fencing close to the road despite requests not to do so. The Plaintiffs objected to the interference of the fences with access for cleaning out the ditches, and to the effect that the fences on both sides of the road make the drivable portion of the road narrow. Over a period of approximately 10 years, Mr. Allard arranged once for a professional contractor come to dig out the portions of the ditches that were filling in. On a couple of other occasions, he has done it himself with a Bobcat. At least once he asked the Perrys to remove some fencing so he could do this and they did so.

In October of 2011, the parties met to try to create a workable arrangement over the issues of fencing and road width. Christine Barnes kept notes of the meeting and circulated it, and titled it "Mending Walls." The parties agreed as to allocation and procedures for maintenance costs, but no long term agreement was made about the fencing. At the time of the meeting, the Perrys removed the existing fencing anyway because it was October, but the disagreement continued thereafter. At times, the Perrys have mentioned the possibility of installing permanent, non-movable fencing. So far they have not done so.

In 2012, the Perrys again installed fencing close to both sides of the common road. The Plaintiffs requested that it be moved. There was an unpleasant confrontation over the issue between James Perry and Christine Barnes.

In 2013, the Perrys constructed a separate driveway leading to their house from Little Northfield Road to their residence. It is parallel to Windy Meadow Road, and is called "Buddy's Way," and it is the road they now use for themselves and visitors to their

home for ingress and egress. James Perry testified that the purpose of it was to alleviate the conflict with the Plaintiffs. However, it resulted in an escalation of conflict, because once they had built Buddy's Way, they declined to contribute to maintenance costs of the common portion of Windy Meadow Road on the grounds that their use of it is insignificant. This only exacerbated the fencing dispute, which continued.

The Perrys claim that they will only use the common road 2–3 times a year: to move the cow fencing to and from its location by tractor and for brushhogging access. They claim that since they no longer use it as their primary access road, they no longer make "significant use" of it, and therefore no longer have an obligation to contribute to expenses. The spur connecting their residence to the common road remains in place, and has been improved with the erosion control measures described above. They have not given up their right to use the common road, and acknowledge that they will use it occasionally, but they claim that they will use it no more often than the owners of the two undeveloped lots, who visit their land only infrequently and do not contribute to expenses. They claim that their placement of fences does not interfere with the Plaintiffs' use of the Windy Meadow Road, and that they have the right to use their land in this manner.

Plaintiffs want the fences to be set back a distance of 12 ½ feet on each side of the traveled roadway, or the outer edge of the ditch, whichever is greater. They also seek a declaration that the Perrys have the obligation to contribute a one-third share toward maintenance costs regardless of the extent of their use.

**Conclusions of Law**

*Fences*

The Perrys have the right to use the land they own within the 50 foot wide easement strip to the extent that their use does not interfere with the uses by the easement holders. Restatement (Third) of Property: Servitudes § 4.9 cmt. c ("The person who holds the land burdened by a servitude is entitled to make all uses of the land that are not prohibited by the servitude and that do not interfere unreasonably with the uses authorized by the easement or profit. An easement is a nonpossessory interest that carves out specific uses for the servitude beneficiary.").

There are two issues concerning fencing: width of the available driving space between the fences on both sides of Windy Meadow Road, and access to the ditches for maintenance.

In applying the above-stated principle from the Restatement of Property to the facts of this case, the court concludes that when the Perrys erect fencing, even temporary fencing, that restricts the travel path to 14 feet in width, they are interfering unreasonably with the rights of the easement holders to use Windy Meadow Road. The easement is 50 feet wide. Windy Meadow Road has been constructed to provide a traveled width of 16-20 feet, with shoulders and ditches extending beyond that. A 14-foot width between

5

fences results in a cramped and narrower width than is reasonable for a road constructed to those dimensions. The court concludes that a balancing of interests of the easement beneficiaries' comfortable use of the easement with the underlying landowners' utilization of the land for grazing results in the following guidelines:

—at no time should fencing of any type be placed closer than 10 feet from the centerline of the traveled portion of Windy Meadow Road;

—permanent fencing may not be placed closer than 12 ½ feet from the centerline of the traveled portion of Windy Meadow Road.

This should result in a comfortable width for use of Windy Meadow Road as use width should include both the traveled portion and a reasonable amount of shoulder. It allows some ditch and some shoulder area to be available for grazing without unreasonably interfering with road use.

These widths also allow some access to the ditches for ongoing maintenance. Because they may not allow full and sufficient access for all necessary ditch maintenance, the Perrys shall be required to remove any temporary fencing for the purpose of ditch maintenance (including the type of seasonal fencing currently used for cows and pigs) within 48 hours of any reasonable request, and to remove any permanently installed fencing for the purpose of ditch maintenance within 7 days of any reasonable request. The width standards should minimize the frequency of need for such requests, and balance the interests of both parties.

It should be noted that these standards are applicable as long as Windy Meadow Road continues at its current level of development. It is possible that at some point in the future, the easement beneficiaries may elect to widen the road, and they will have the right to do so as long as all road use is within the 50-foot right of way. At such time, the specific distances for fencing set forth herein will no longer be applicable, and wider distances will need to be established and observed.

*Maintenance Costs*

Defendants rely on three bases in seeking a declaration that they should no longer have to contribute a one-third share to maintenance costs.

They rely on the word "reasonable" in the easement language as indicative of their need to only contribute a "reasonable" share. However, the use of the word "reasonable" in the easement provisions is for a different purpose. The provision is that the easement is for access "by all reasonable means." This refers not to how maintenance costs should be allocated but to the manner in which the easement holders may travel across the right of way, e.g., by passenger car, truck, farm vehicle, snow machine, foot, etc. In other words, the extent of use is not limited to pedestrian travel on a path, for example, or for farm use only, as some easements are. Thus the provision that refers to 'reasonableness' is simply not specifically applicable to the issue in dispute.

6

Secondly, they rely on the provision that specifies that the obligation to contribute to maintenance costs is only triggered once a lot owner makes "significant use" of one of the benefitted lots: "Grantors and Grantors' successors to Grantors' reserved lands and premises shall not be required to pay any costs or expenses for the construction, maintenance or replacement of any improvements on the said common right-of-way until such time as Grantors or Grantors' successors in title shall make *significant use of the said improvements*." (Emphasis added.) They argue that because they have now constructed their own separate road and will now only be making minimal use of the common portion of Windy Meadow Road, their obligation to contribute should be abated.

Finally, they argue that, pursuant to 19 V.S.A. § 2702, their contribution need only be "rateable," which they define as proportionate to use, and since their use will now be minimal, they should have no obligation to contribute. Note, however, that rateable means "proportionate" and in this context does not necessarily mean proportionate *to use*. See Black's Law Dictionary 1268 (7th ed. 1999) (ratable); Restatement (Third) of Property (Servitudes) § 4.13 cmt. e. ("The basis of fair apportionment will vary depending on the circumstances."). Thus, even if 19 V.S.A. § 2702 were the sole source of guidance, there would still be an issue as to whether "proportionate" (rateable) contributions should be proportionate to use or to the number of lots served or to the number of developed lots served or to some other measure.

This last argument, that contributions should be rateable or proportionate under 19 V.S.A. § 2702, might be compelling if it were not for the specific terms of the easement created in the original deed from the Wrights, quoted above. Section 2702 provides guidance for circumstances in which no specific provision in a governing instrument applies. "In the absence of an express agreement or requirement governing maintenance of a private road, each person shall contribute rateably to the cost of maintaining the private road. . ." *Id.*

In this case, the Wrights, in creating the easement, set forth a detailed set of provisions spelling out not only the location and extent of use of the easement, but the type of expenses for which each owner was and is obligated, and the timing of when such obligations arise. The scheme is much more detailed than the typical grant of an easement in historical deeds, and demonstrates an intention to establish for all lot owners in the Wright subdivision a clear set of legal rights and obligations with respect to the common portion of the easement:

1. No lot owner who developed a lot after a road was constructed on the easement was/is obligated to contribute to road construction costs retroactively. (The Perrys benefited appropriately from this provision, and properly declined to contribute to such costs.)
2. It is at the time that a lot is improved that the lot owner's obligation to contribute a specified proportionate share for road expenses is triggered.
3. The right to use the common portion of the road is one of the property rights that any owner of the Perry lot (and any owner of all the lots) acquires.

4. Together with the right to use the common portion of the road in connection with the improvements on the Perry lot (as on all lots) comes the obligation to contribute to common road expenses equally with other owners of lots that have been improved.
5. Both the benefit of the use of the easement and the obligation to contribute to expenses run with the land.
6. There is no provision for termination of the obligation to contribute equally with other owners of improved lots based on reduced usage

This scheme gave (and gives) clear notice to any prospective purchaser of a lot in the Wright subdivision of both the obligations and benefits with respect to contribution to maintenance of Windy Meadow Road: their proportionate share of maintenance expenses will be equal to the number of improved lots in the Wright subdivision. For example, it would be unfair to a purchaser of one of the undeveloped lots to purchase and improve the lot in reliance on the specific terms of the legal rights in the easement instrument that his or her share of maintenance costs would be one-fourth of the total (and may become one-fifth if and when the fifth lot is developed) only to discover that despite the fact that the owner of the Perry  lothas full rights to use Windy Meadow Road, that owner does not contribute and the new owner's share would be one-third and not one-fourth.

The Perrys have not relinquished or waived, by proper legal instrument, their right to use Windy Meadow Road. On the contrary, they plan to continue to use it at the level of frequency of their choice. The right to use Windy Meadow Road is one of the property rights enjoyed by owners of their lot. Consequently, as owners of one of the improved lots in the Wright subdivision that has the benefit of the use of Windy Meadow Road, they also have the concomitant obligation to contribute their required share to maintenance costs, whether they use the road as frequently as others or not. The deed creating the easement provided for the timing and amount of commencement of the ongoing contribution obligation, and despite being complete and comprehensive, the deed did not allow for the termination of the obligation based on limited use.

This reflects the clear intent of both the Grantors and Grantees of the easement as set forth in the deed in which the parties' respective legal interests and obligations were created. The terms are not ambiguous. If there were no such provisions, the Perrys' arguments would be pertinent, but the court's obligation is to enforce the legal rights and obligations of the parties as created by the legal instrument.

Therefore, the court declares that the Defendants are obliged to contribute to common road maintenance expenses a share that is equal to that of the other owners of improved lots, despite the fact that they have now constructed their own separate access road that they use most of the time.

**Order**

Plaintiffs' attorney shall prepare a Declaratory Judgment based on the conclusions set forth above.  Defendants' attorney shall have five business days to file any objections to the form of the proposed judgment.

Dated at Montpelier this 19th day of December, 2014.

_____
Hon. Mary Miles Teachout
Superior Judge